IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ANN COFFMAN,

        Plaintiff,

                                   3:13-CV-01242-PK

                                   OPINION AND ORDER

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

_____

PAPAK, Magistrate Judge:

        Plaintiff Ann Coffman filed this action July 22, 2013, seeking judicial review of the

Commissioner of Social Security's final decision denying her applications for supplemental

security income ("SSI") under Title XVI of the Social Security Act (the "Act") and disability

insurance benefits under Title II of the Act. This court has jurisdiction over plaintiff's action

pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

Page 1 - OPINION AND ORDER

Coffman argues that by erroneously rejecting medical evidence and erroneously rejecting her testimony regarding the extent of her impairments, the Commissioner failed properly to assess her residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and for that reason erred by finding Coffman capable of performing her past relevant work as a wax pattern repairer and housekeeper at step four of the process.

I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, Coffman's action is remanded  pursuant to sentence four of 42 U.S.C. § 405(g) for the calculation and payment of benefits.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See*

*Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b).  Otherwise, the

evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.

*See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 416.920(a)(4)(ii).  An impairment is

"severe" if it significantly limits the claimant's ability to perform basic work activities and is

expected to persist for a period of twelve months or longer.  *See Bowen*, 482 U.S. at 141; *see also*

20 C.F.R. § 416.920(c).  The ability to perform basic work activities is defined as "the abilities

and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); *see also Bowen*, 482 U.S. at

141.  If the ALJ finds that the claimant's impairments are not severe or do not meet the duration

requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20

C.F.R. §§ 416.920(a)(4)(ii), 416.920(c).  Nevertheless, it is well established that "the step-two

inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80

F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154.  "An impairment or

combination of impairments can be found 'not severe' only if the evidence establishes a slight

abnormality that has 'no more than a minimal effect on an individual['] s ability to work." *Id.*,

*quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at

which the ALJ determines whether the claimant's impairments meet or equal "one of a number of

listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii),

404.1520(d), 416.920(a)(4)(iii), 416.920(d).  If the claimant's impairments are equivalent to one

of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will

conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv),  416.920(a)(4)(iv).  If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(a)(4)(iv), 416.920(f).  In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560©, 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253

F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent findings of fact in determining whether the ALJ's findings are supported by substantial evidence of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[2]

Coffman was born February 27, 1959. Tr. 249.[3] She attended school through the tenth grade, and has received no subsequent formal education or vocational training. Tr. 254. According to the evidence of record, prior to her claimed disability onset date of March 15, 2008, Coffman worked full-time as a pattern finisher from 1984 to 1999, worked full-time as a housekeeper from 2002 through 2004, worked full-time as a production/assembler from 2005 to 2007 and worked full-time as an operator/production work from January 2007 through April 2008. Tr. 254.

In October 2006, Coffman saw Christopher Baldwin, M.D., reporting right shoulder pain, lightheadedness, and facial numbness. Tr. 331. Dr. Baldwin diagnosed right rotator cuff tendonitis and orthostatis from dehydration and anxiety. In November 2006 Coffman complained of dizziness lasting three weeks, nausea and vomiting, and right ear pain. Tr. 330.

---

[2] The following recitation constitutes a summary of the evidence contained within the Administrative Record, and does not reflect any independent finding of fact by the court.

[3] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 12.

Dr. Baldwin diagnosed anxiety causing dizziness and prescribed klonopin and mecalzine.    On December 1, 2006, Coffman was seen by Jimmy Liao, M.D., reporting recurrent lightheadedness, stress, and depression. Tr. 328.  She was crying.  Coffman had previously taken antidepressants. Dr. Liao diagnosed rotator cuff syndrome and anxiety/depression and prescribed Prozac.

On December 8, 2006, Coffman was seen by Kathleen Bonilla at the Cascadia Walk-In Clinic for extreme anxiety and nightmares.  Tr. 299.  Coffman was diagnosed with Post Traumatic Stress Disorder ("PTSD"), assessed a GAF of 45, and prescribed Seroquel. Tr. 300.

On December 13, 2006, Coffman returned to the Clinic and George H. Miller, P.A.-C. diagnosed PTSD and an adjustment disorder related to the recent loss of an abusive relationship. Tr. 297.  He prescribed Clonidine.  The next day Coffman returned, reporting nightmares and dissociation.  Tr. 296.  Her affect was labile and tearful.

Coffman returned to the Clinic on December 28, 2006, and was seen by Robert Rees, Q.M.H.P.  Tr. 294.  She was "dramatic and sad," angry, irritable and labile.  *Id.*  Coffman was seen by Physician's Assistant Miller, and was tearful.  Miller's impression was PTSD and acute adjustment disorder with anxiety.  He prescribed Vistaril.  Tr. 295.

On February 15, 2007, Coffman was seen by Jodi DeMunter, M.D., to establish care.  Tr. 322.  Coffman reported right shoulder pain for the past month and depression, better for the last three months while on Prozac.  Dr. DeMunter refilled the Prozac prescription.

On December 4, 2007, after an accident at work, Coffman was seen by Dr. Baldwin for lower back pain.  Tr. 316.  He prescribed robaxin and vicodin.  Ten days later she was seen by John Schumacher, M.D., for low back strain, and received robaxin and vicodin.  Tr. 314-15.

On February 18, 2008, Coffman reported to Dr. DeMunter that Prozac was no longer controlling her depression. Tr. 312. Coffman reported significant stressors, anxiety and depression, and demonstrated slowed psychomotor movement and a flat affect. Tr. 313. Dr. DeMunter increased the Prozac. In March 2008 Coffman had a hysterectomy. Tr. 346.

The next medical record is dated April 13, 2010. Tr. 306. Stacey Campbell, P.A.-C., recorded a rash on Coffman's tongue and abdominal pain.

On May 9, 2010, Carolyn Phelps, M.D., D.O., conducted a psychiatric assessment at the request of the police after Coffman threatened to shoot herself. Tr. 285-88. Coffman acknowledged making the statement out of frustration and denied suicidal ideation. She reported increasing depression and anxiety over the past several months, she was frequently tearful, her affect was dysphoric, thought process tangential, insight and judgment fair. Tr. 285. Dr. Phelps diagnosed PTSD and prescribed hydroxyzine and fluoxetine. Tr. 286.

Dr. DeMunter saw Coffman on May 19, 2010. Tr. 301. Coffman reported an acute worsening of anxiety and depression, and had been off her medications for over a year. *Id.* Dr. DeMunter noted anxiety, psychomotor agitation, and tangential/circumferential speech, recommended counseling, and prescribed clonazepam. Tr. 302.

On June 9, 2010, Coffman protectively filed an application for disability insurance benefits, claiming a disability onset date of March 15, 2008, and an application for supplemental security income. Tr. 196-203, 204-207. She met the insured status requirements of the Act through June 30, 2011. Tr. 18. In connection with her applications, Coffman claimed to be disabled by "severe depression/anxiety/panic attacks/insomnia." Tr. 253. Coffman characterized the impairments caused by those conditions as follows:

Page 8 - OPINION AND ORDER

> Emotional pain all the time, and neck pain when stressed. Every-
> thing is worse my neck pain is an aching pain, sometimes
> shooting pain...every day every night constant it does not go
> away.

Tr. 268.

Coffman reported that the pain is caused by "everything, lifting, pushing, carrying things,

trying to do housework or gardening, shopping, driving." *Id.* The pain is increased by stress,

lifting, pushing and reaching. Coffman stated she had to rest after each effort or chore, and had

to rest when grocery shopping. Coffman stated fatigue prevented her from doing anything, and

that she could be up and active for ten to thirty minutes before needing to rest. *Ibid.*

On June 12, 2010, Coffman reported to Barbara Russell, P.M.H.N.P., that she was

referred by her primary care physician who would no longer prescribe psychiatric medications for

her. Tr. 289. Coffman stated her PCP recently took her off prozac and vistaril and she was on

Klonopin only. She reported low energy and insomnia, and enjoyed gardening, taking care of her

animals, walking, fishing with her daughter, and painting. Nurse Practitioner Russell noted a

restricted affect and anxious/depressed mood. Russell reported Coffman "is not a good

historian. Her speech is repetitive, tangential and can be confusing." *Id.* She diagnosed

depression not otherwise specified, and prescribed celexa and vistaril. Tr. 290.

On June 17, 2010, Coffman was seen in the emergency room for abdominal pain for the

past year and dizziness, and was prescribed meclizine. Tr. 332-45. On July 9, Vivianne

Delorres, Q.M.H.P., L.P.C., reported Dr. DeMunter was concerned Coffman might be

schizoaffective or schizophrenic and required a referral to a psychiatrist. Tr. 361.

On July 14, 2010, Coffman's daughter, Joni E. Coffman, completed a Third Party Function Report. Tr. 260-67. Ms. Coffman reported she lived with her mother, and that neck problems limited Coffman's range of motion and ability to lift. Tr. 260. The daughter stated mental health issues severely limited her mother's ability to get along with and communicate with other people, and that Coffman either slept 12 hours a day or not at all. Tr. 261. Coffman would go four days without bathing, and she had stored feces and urine in coffee cans for months. Tr. 266. Ms. Coffman reported her mother had delusions, repeats herself, and starts arguments. *Id.*

On July 22, Steven Herzberg, L.C.S.W., saw Coffman who requested a refill of the Celexa and reported "the Celexa is 'working good.'" Tr. 363. Mr. Herzberg encouraged counseling.

On August 21, 2010, Justine Williams, Psy.D. examined Coffman. Tr. 370-75. Coffman reported depression since the death of her father in 2007, said she was "mostly down" and sometimes "really down." Tr. 370. She reported insomnia, anxiety and panic attacks during which she has numbness in her fingers and head, difficulty breathing, shaking, increased heartbeats, and she wants to run away. Tr. 371. Coffman reported childhood and adult abuse, and asserted she had been hospitalized for vertigo for a few weeks in 2010. Tr. 372. She slept two hours a night and did not nap, and helped care for her elderly mother. Tr. 373. Coffman said she did a little bit of sweeping, some dishes, and minor housework. Dr. Williams noted incongruent affect and tangential speech. *Id.* Dr. Williams diagnosed major depressive disorder, recurrent, moderate, PTSD, and panic disorder without agoraphobia, with poor prognosis and a GAF of 60. Tr. 374. Dr. Williams functional assessment was that Coffman had the ability to

perform simple, repetitive tasks, though more complex and detailed tasks would be very difficult. Tr. 375. She questioned Coffman's ability to get along with others, and stated Coffman would do better with minimal public contact and written instructions.

On August 31, 2010, the Administration determined that Coffman's conditions caused limitation to no more than occasional public contact and only required interaction with co-workers, Tr. 82, and that Coffman retained the ability to return to past relevant work as an operator/production work. Tr. 74-84. Administration consulting psychologist Joshua J. Boyd, Psy. D., completed a Mental Residual Functional Capacity Assessment, diagnosing Affective Disorder and Anxiety Disorder, Tr. 79, and opining that Coffman was moderately limited in the ability to understand and remember detailed instructions and was limited to simple, routine tasks best described in written instructions. Tr. 81. Dr. Boyd opined that Coffman was moderately limited in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to work in coordination with or in proximity to others without being distracted by them. *Id.* Dr. Boyd concluded Coffman is limited to no more than occasional public contact and only required interaction with co-workers due to bouts of depression and occasional panic attacks. Dr. Boyd found that Coffman's statements regarding her impairments were "partially credible." Tr. 80. On the basis of Dr. Boyd's assessment of Coffman's RFC, the Administration found Coffman not disabled by Affective and Anxiety Disorders. On September 2, 2010, the Administration advised Coffman that she was not disabled for purposes of the Act. Tr. 133.

On September 10, 2010, Coffman requested reconsideration of the Administration's finding of non-disability. Tr. 1488-50.

Page 11 - OPINION AND ORDER

On November 22, 2010, on reconsideration of Coffman's medical records,

Administration consulting psychologist Bill Hennings, Ph.D., agreed with the mental limitations

assessed by Dr. Boyd. Tr. 104-05, 106-108. On December 3, 2010, Administration consulting

physician Neal E. Berner, M.D., agreed with the limitations assessed by the Administration. Tr.

98-109. The Administration notified Coffman of its decision on reconsideration on December 8,

2010. Tr. 145-46.

On December 14, 2010, Coffman requested a hearing before an Administrative Law

Judge. Tr. 157. In connection with that request, Coffman reported no changes in her condition.

On February 8, 2011, Janel Guyette, M.D., began treating Coffman. Tr. 505. Coffman

reported abdominal pain since May 2010, as well as sleep disturbance, hot flashes and vertigo.

Coffman stated her depth perception had worsened, and that she had had vertigo in June that

lasted ten days. She reported constant dizziness and that she was "wobbly and stumble a lot and

fall down." *Id.* Coffman stated she had a constant sound in her ear with decreased hearing, and

jabbing pains in her left ear. Coffman had stomach pain and spasms so severe since May 2010

she would fall down. She had insomnia. On February 11 Dr. Guyette diagnosed an ulcer and

vitamin B12 and vitamin D deficiencies . Tr. 502.

On March 1, and March 22, 2011, Dr. Guyette saw Coffman for continued insomnia,

anxiety, neck pain, and abdominal pain. Tr. 486, 480. A March 28, 2011, MRI of the cervical

spine revealed a disc-osteophyte complex effacing the ventral subarachnoid space with severe

left neural foraminal narrowing at C5-6, and a disc-osteophyte complex effacing the ventral

subarachnoid space and flattening the anterior cord at C6-7, with bilateral severe neural

foraminal narrowing. Tr. 379.

Page 12 - OPINION AND ORDER

On April 4, 2011, Coffman was examined by neurologist Vitalle D. Lupu, M.D.  Tr. 400-02.  Coffman's chief complaint was chronic dizziness and bilateral arm paresthesias.  Tr. 400.  Dr. Lupu reviewed the March 28 cervical MRI as well as an MRI of the brain which showed "moderate patchy central pontine bright signal on FLAIR reflecting chronic small vessel changes.  These findings were unusual for the patient's biological age of 52 and suggestive of central pontine myelolysis." *Id.*  Dr. Lupu found Coffman oriented to place, time, and person, but stated she "appears slightly slurred and has mild psychomotor slowing." Tr. 401.  Dr. Lupu found Coffman had full muscle strength in upper and lower extremities and her gait and station were normal.  *Id.*  Dr. Lupu noted the MRI was consistent with nonspecific white matter changes, predominantly in the brainstem, "which is unusual.  There may be a link between the brainstem MRI findings and her subjective dizziness."  Tr. 401.  Dr. Lupu ordered spinal fluid testing which was positive for Lyme and Ehrlichia titers.  Tr. 405.  On June 14, 2011, Dr. Lupu ordered a second spinal tap which showed an elevated white blood cell count.  Tr. 408.

On August 30, 2011, Dr. Guyette examined Coffman for "debilitating cervical radiculopathy" and increasing dizziness, and completed  forms prepared by counsel in which she opined Coffman retained the physical capacity to lift and carry less than ten pounds occasionally, the ability to sit, stand and walk less than two hours in an eight hour day, and required the ability to change position at will.  Tr. 453, 412.  Dr. Guyette stated Coffman would need to lie down at unpredictable intervals during a work shift, and should never twist, stoop, crouch or climb ladders.  Tr. 413-14.  Dr. Guyette concluded Coffman would miss more than three days of work each month.  Tr. 415.  In assessing mental impairments, Dr. Guyette concluded Coffman would miss more than four days a month of work due to her impairments and treatment.  Tr. 419.

Page 13 - OPINION AND ORDER

Dr. Lupu reported on September 12, 2011, that Coffman's dizziness, fatigue, depression, and insomnia were improved since starting vitamin B12 and vitamin D supplements. Tr. 581.

On September 29, 2011, Dr. Guyette examined Coffman for neck and upper extremity weakness and general fatigue, noting "[t]he cervical stenosis in her neck is so severe she is unable to do the bare minimum as far as activities of daily living." Tr. 441. Coffman returned to Dr. Guyette on October 22 with increasing dizzy spells and nerve tingling in her arms, leg, and feet, and global weakness of 3/5. Tr. 436. Dr. Guyette's primary diagnosis was central pontine myelinolysis. Tr. 437. Coffman was to continue vitamin B12 and D injections, synthroid for hypothyroidism, Diazepam, Citalopram, and Ranitidine. Tr. 436.

In January 2012, Coffman's sister Leslie Morrow wrote a letter in which she states that "[d]ue to complications resulting from medical conditions [Coffman] is no longer able to work to support herself." Tr. 273. In February 2012 Coffman's sister Sandy Farley wrote that Coffman suffers from medical complications that have prevented most activities and affected her speech at times. Tr. 274. Ms. Farley noted her sister is weak and cannot support herself.

On March 8, 2012, a hearing was conducted before an ALJ in connection with Coffman's applications. Tr. 33-73. Coffman, her counsel, and a vocational expert were present, and Woodrow Janese, M.D., appeared by telephone. Tr. 33. At the hearing, Coffman testified in relevant part that she was unable to walk very far, that she sometimes stumbles and falls, she can't use her right arm very long, and she loses all feeling in her left arm. Tr. 44. Coffman stated she sometimes loses all feeling in both arms and legs, and has severe spasms that go up the back of her neck and make her vomit. Tr. 45. She has problems with her neck and has a hard time

turning her head. *Id.* Coffman testified she has a spastic bowel and optical migraines that can last for 12 hours. Tr. 46-47.

Woodrow W. Janese, M.D., reviewed Coffman's medical records and testified "the only severe problem as presented in the record was her cervical spine, which did not meet or equal" a listing. Tr. 56. Dr. Janese opined that Coffman's residual functional capacity was for medium work, with the ability to lift 50 pounds occasionally, and 25 pounds frequently, six hours of sitting and six hours of standing. Tr. 57.

On April 12, 2012, the ALJ denied Coffman's applications Tr. 16-27. Coffman timely requested review of the ALJ's decision, Tr. 10, and the Appeals Council denied her request on May 17, 2013. Tr. 1-3. In consequence, the ALJ's decision of April 12, 2012, became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Coffman did not engage in substantial gainful activity at any time following her claimed disability onset date of March 15, 2008. Tr. 18. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Coffman's medical impairments of "cervical spine degenerative disc disease, depression, and anxiety" were "severe" for purposes of the Act. Tr. 18. Because the impairments caused by Coffman's cervical spine degenerative disc disease, depression, and anxiety were deemed severe, the ALJ properly proceeded to the third step of the analysis.

Page 15 - OPINION AND ORDER

At the third step, the ALJ found that none of Coffman's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 20. The ALJ therefore properly conducted an assessment of Coffman's residual functional capacity. Specifically, the ALJ found Coffman had the capacity to perform light work except she can perform no climbing, other than ramps and stairs, should avoid concentrated exposure to workplace hazards, and is limited to performing routine, repetitive tasks that involve no more than occasional interaction with coworkers and the public. Tr. 21.

At the fourth step of the five-step process, the ALJ found that Coffman was able to perform her past relevant work as a wax pattern repairer and housekeeper. Tr. 26. On that basis, the ALJ concluded that Coffman was not disabled as defined in the Act at any time between March 15, 2008, and April 12, 2012. Tr. 26.

## ANALYSIS

Coffman challenges the Commissioner's assessment of her residual functional capacity. Specifically, Coffman argues that the Administrative Law Judge improperly rejected the August 2011 opinion of treating physician Guyette, improperly failed to credit Coffman's own testimony regarding the severity of her symptoms, and improperly rejected the lay testimony. Because the first assertion is dispositive, the court need not address all of the allegations.

I.    **Residual Functional Capacity**

    A.    **Medical Opinion of Treating Physician Guyette**

An ALJ may properly reject a treating physician's uncontradicted medical opinion only for "clear and convincing reasons." *Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1995).

Page 16 - OPINION AND ORDER

When the treating physician's opinion has been contradicted, however, it may be rejected for

"specific and legitimate reasons that are supported by substantial evidence in the record."

*Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). This can be done

by setting out a detailed and thorough summary of the facts, providing an appropriate

interpretation thereof, and making findings. *See Megallanes v. Bowen*, 881 F.2d 747, 751 (9th

Cir. 1989).

As set out above, Dr. Guyette opined Coffman would be absent from a workplace more

than four days a month on average, and could never twist, stoop, bend, or climb ladders, and

could occasionally climb stairs. Her impairments would affect her ability to reach, handle, feel,

and push/pull, and limit her to lifting and carrying less than ten pounds. Tr. 412-19. Dr. Guyette

cited Coffman's brain MRI and MRA tests, the MRI of her cervical spine, instability and

weakness on physical examination, EMG and positive tests for neuropathy, and positive titers for

Lyme disease. Tr. 413.

Here, the ALJ found in relevant part as follows:

> Simply put, the objective medical evidence, including Dr. Guyette's
> own treatment notes, does not support the degree of limitation that
> she proposes. Her opinion is also inconsistent with the other
> opinions of record, particularly medical expert and neurologist Dr.
> Janese. It is also contrary to the largely negative findings by the
> treating neurologist, Dr. Lupu. Accordingly, Dr. Guyette's opinion
> receives limited weight.

Tr. 25.

Dr. Guyette's treatment notes document severe abdominal pain, heaviness and numbness

in Coffman's arms, difficulty turning her head due to neck pain, and weakness against resistance

in her upper extremities. Tr. 486, 489. Dr. Guyette noted the March 2011 MRI showing a disc-

Page 17 - OPINION AND ORDER

osteophyte complex at C5-6 effacing the ventral subarachnoid space and causing severe left

neural foraminal narrowing, and showing at C6-7 a disc-osteophyte complex effacing the ventral

subarachnoid space and flattening the anterior cord with bilateral severe neural forminal

narrowing.  Tr. 379.  On March 22, 2011, Dr. Guyere noted Coffman's fatigue, insomnia, post-

menopausal symptoms, shortness of breach when walking and talking, and dizziness.  Tr. 480,

483.  On March 31 Dr. Guyette recorded dizziness and upper and lower extremity weakness

against flexion and extension against resistence.  Tr. 390.  Dr. Guyette noted Coffman's

problems included vertigo, tinnitus, and cervical radiculopathy.  Tr. 391.

 Dr. Guyette received Dr. Lupu's reports, in which Coffman complained of chronic

dizziness, bilateral arm paresthesias, and insomnia.  Tr. 400.  Dr. Guyette received Dr. Lupu's

interpretation of the April 2011 brain MRI showing chronic small vessel ischemic change, and

Dr. Lupu's observation of mild psychomotor slowing.  *Id.*  On April 25, 2011, Dr. Lupu reported

to Dr. Guyette that Coffman had a low Vitamin B12 level and two positive Lyme disease titers.

Tr. 403.  On April 29, 2011, Dr. Guyette treated Coffman for bilateral arm numbness, abdominal

pain, and dizziness.  Tr. 395.  On June 11, 2011, Dr. Guyette treated Coffman for increasing

dizziness, abdominal pain, and fatigue, and observed shortness of breath while talking and

walking, as well as weakness of her extremities against resistance.  Tr. 471, 474-74.  On June 14,

2011, Dr. Lupu reported to Dr. Guyette that Coffman's cerebral spinal fluid contained an

elevated white blood cell count.  Tr. 408.  On this record, Dr. Guyette's treatment notes support

her opinion regarding Coffman's limitations.

 The ALJ states that Dr. Guyette's opinion is contradicted by Dr. Janese.  Dr. Janese

testified that he did not believe the pathology appearing on the cervical spine MRI was consistent

with the examination results noted by Coffman's doctors. Tr. 59. However, contrary to Dr. Janese's testimony, Dr. Guyette documented abnormalities on examination, including weakness in the upper and lower extremities, spasms in the muscles of Coffman's lumbar and thoracic spine, and intermittent paresthesias in Coffman's arms and legs. Tr. 391, 395, 433, 437, 441, 444, 463, 474-75.

Finally, the ALJ cited the "largely negative" findings by Dr. Lupu. Tr. 25. Dr. Lupu noted the degenerative changes to Coffman's spine as one of the reasons for Coffman's upper back discomfort. Tr. 581.

The ALJ failed to identify clear and convincing or specific and legitimate reasons supported by substantial evidence to give the opinion of the treating physician little weight.

## II. Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F.3d 172, 1178 (9th Cir. 2000), *cert. denied,* 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r,* 635 F.3d 1135, 1138-39 (9th Cir. 2011)(quoting *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for

Page 19 - OPINION AND ORDER

rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart,* 340 F.3d 871, 876 (citing *Bunnell v. Sullivan,* 947 F.2d 871(9th Cir. 2003)(en banc)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue,* 623 F.3d 1032, 1035 (9th Cir. 2010).

The ALJ's failure to credit the treating physician is erroneous for the reasons set out above. The Vocational Expert testified that, if Dr. Guyette's opinion is credited, Coffman would be unable to maintain employment. Tr. 71.

Accordingly, this matter is remanded for the calculation and award of benefits.


## CONCLUSION

The Commissioner's decision is not supported by substantial evidence. For these reasons, the decision of the Commissioner is reversed and this matter is remanded to the Commissioner pursuant to Sentence Four, 42 U.S.C. § 405(g) for the immediate calculation and payment of benefits.

Dated this 24th day of February, 2015.

Honorable Paul Papak
United States Magistrate Judge